JEFFREY JAMES,          )
                              )
          Plaintiff,    )
                              )
         v.           )        1:09CV552
                              )
R.J. REYNOLDS TOBACCO COMPANY,  )
                              )
          Defendant.    )

## MEMORANDUM OPINION AND ORDER

The instant matter comes before the Court on Defendant's Motion for Summary Judgment (Docket Entry 34). (See Docket Entry dated Mar. 4, 2011.)[1] For the reasons that follow, the Court will grant the instant Motion.

## Background

Plaintiff brought this suit against R.J. Reynolds Tobacco Company ("RJRT") for "unlawful employment discrimination on the basis of Plaintiff's race, and unlawful retaliation" under 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. § 2000e et seq. ("Title VII"), as well as for "wrongful termination of Plaintiff" in violation of the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2. (Docket Entry 1, ¶ 7.) Plaintiff's instant action identifies the challenged employment action as the

---

[1] The parties have consented to disposition of this case by a United States Magistrate Judge. (Docket Entry 46.)

termination of his employment by RJRT on April 14, 2008. (<u>Id.</u> ¶¶ 16-19.)[2] The following facts are undisputed:

(1) Plaintiff is an African American male (<u>id.</u> ¶ 9) who "was employed by [RJRT] from in or about September 2001 to on or about April 14, 2008" (<u>id.</u> ¶ 10);

(2) Plaintiff joined RJRT's IT Security & Risk Department ("IT Security") in 2006 (Docket Entry 36-1 at 7)[3] and was responsible for maintaining the part of the company's virtual firewall that "controlled access to the laptop computers" that sales representatives used in the field (Docket Entry 45 at 3 (citing Docket Entry 45-3, ¶ 11));

(3) Plaintiff received a positive performance review in 2006 (<u>see</u> Docket Entry 36-1 at 21-22);

(4) in Plaintiff's 2007 performance review, his supervisors indicated that he "[a]lmost [a]chieves [e]xpectations" (Docket Entry 36-3 at 25; <u>see also</u> Docket Entry 36-1 at 22-23), although

---

[2]     The Complaint references RJRT's earlier decision to outsource Plaintiff's position to another company at a later date (<u>see</u> Docket Entry 1, ¶¶ 11-14) and alleges that Plaintiff "was the only African American in the [IT Security] group," as well as "the only person in [RJRT's] IT Security group who was advised that his or her services were no longer needed" (<u>id.</u> ¶ 11). However, those allegations relate to the circumstances that led Plaintiff to make an internal complaint with RJRT and thus undergird the retaliation claim(s) in this case. Fairly read, Plaintiff's Complaint does not assert discrimination or retaliation claims other than as to his firing.

[3]     All pin citations to Docket Entries refer to pagination in the CM/ECF footer appended to each document.

Plaintiff believed he had "[done] more than any of [his] counterparts, and [] didn't see anything in [the review] that basically said [he] didn't do or [] didn't meet . . . [his] expectations" (Docket Entry 36-1 at 27);

(5) Plaintiff did not "have any reason to think that [the 2007] performance assessment was somehow racially discriminatory against" him (id. at 21);

(6) "[i]n January of 2008, numerous employees in the IT Infrastructure department, and [Plaintiff] from IT Security, were notified that their positions were being eliminated after a transition period, as their functions were being outsourced to EDS" (Docket Entry 35 at 4; see also Docket Entry 36-1 at 29-30);

(7) although Plaintiff was the only African American employee whose job was outsourced at that time (see Docket Entry 36-2 at 49), he did not then believe the outsourcing of his job was racially motivated (Docket Entry 36-1 at 33-34);

(8) Plaintiff was subsequently offered a job at EDS which was to commence in August of 2008 (Docket Entry 36-3 at 30);

(9) on March 27, 2008, Plaintiff made a change to the part of the firewall that "controlled the interface between the laptop computer in the field and the networked computer at RJRT headquarters" (Docket Entry 45 at 4-5 (citing Docket Entry 45-3, ¶¶ 13 & 14); see also Docket Entry 35 at 5);

3

(10) shortly after Plaintiff made the change, "trade marketing employees began having problems connecting to the RJRT server through their laptops" (Docket Entry 35 at 5 (citing Docket Entry 36-2 at 4-7));

(11) later that same day (March 27, 2008), Plaintiff reversed the change he had made to the firewall, but did not tell anyone that day about either the change or the reversion (id. at 5-6 (citing Docket Entry 36-2 at 8-9, 10-11));

(12) on March 28, 2008, while connectivity problems continued, Plaintiff "made a 'fresh copy' of the firewall policy as it existed on the 27th" and, as a result, "the previous versions of the policy were deleted (including the changes [Plaintiff] made on the 27th)" (id. at 7 (citing Docket Entry 36-2 at 28-30));

(13) Plaintiff did not inform anyone on March 28, 2008, of any of the changes he had made (id. (citing Docket Entry 36-2 at 32));

(14) for several days, various members of IT Security attempted to determine the cause of the laptop connection problem (id. at 7 (citing Docket Entry 36-2 at 37-38; Docket Entry 36-5, ¶ 3)), although an IT Security employee found a tedious "fix" on March 28, 2008, that could be implemented laptop-by-laptop as problems arose (id. (citing Docket Entry 36-2 at 37-38));

(15) on April 4, 2008, "Plaintiff complained to [RJRT's] Human Resources Department that he was being discriminated against on the basis of his race" (Docket Entry 1, ¶ 15; see also Docket Entry 35

4

at 8 ("[O]n April 4, 2008, [Plaintiff] met with Marcy Mills . . . in the Human Resources department because of 'all of the little events, all of the little things that were going on.'" (quoting Docket Entry 36-2 at 44)));

(16) Plaintiff felt discriminated against because, among other things, a white IT Security employee "was assigned . . . to troubleshoot the laptop connection issue on March 27th [despite Plaintiff's familiarity with the system] and [] [Plaintiff] was the only African American employee in IT Security in transition to EDS" (Docket Entry 35 at 8 (citing Docket Entry 36-2 at 45-49));

(17) on April 9, 2008, Plaintiff met with his direct supervisor, Garry Blanks, to discuss Plaintiff's transition to EDS as well as the laptop problem (see Docket Entry 37-1), at which time Plaintiff explained his thought process behind undoing the change he had made on March 27, 2008 (id. at 21-23) and Blanks stated, "let's just say people may have listened to you and walked away with we didn't change anything" (id. at 23);

(18) on April 11, 2008, Plaintiff met with Ella Long, the Senior Director Workplace Practices & HR Compliance (Docket Entry 37-2 at 1), and Linda Wood, the Senior Director HR Strategic Partner (id. at 2), to discuss "the changes he had made to the firewall policy" (id.), at which time Plaintiff stated he never used his individual login account and could not recall the password to that account (see id. at 3; Docket Entry 36-2 at 20-21); and

5

(19) on April 14, 2008, RJRT fired Plaintiff, allegedly because he "did not inform [his] peers nor did [he] inform management about the changes [he] made on March 27, 2008 . . . [and] [he] misrepresented that [he] did not make any changes to the Checkpoint Integrity Firewall on multiple occasions when questioned by management and [his] peers" (Docket Entry 36-3 at 47).

According to RJRT, it was not until April 9, 2008, that Plaintiff "finally mentioned to Blanks that he did modify the internal part of the group firewall policy on March 27[th] . . . ." (Docket Entry 35 at 10.) That conversation reportedly took place after another IT employee "found a version of the firewall policy dated March 27, 2008 with 'jamesj2' as the author." (Id. at 9 (citing Docket Entry 36-5, ¶ 4).) As a result, RJRT contends that, "on or about April 7, 2008, [an IT supervisor, Michael Mazza] became interested in looking at the firewall policy history to see what had changed." (Id. (citing Docket Entry 36-7 at 2-3 ("After looking at the log, it showed two things of concern: One, a policy had been changed around the time when we were having the issues, and there was a lack of history of prior changes.")).) RJRT further maintains that, on April 9, 2008, Blanks explained to Plaintiff that Blanks was "looking at the data base from before [March] 29th" (Docket Entry 37-1 at 19) and said:

> I got to go through the policies and be able to prove everybody [sic] that, look, nothing changed. Here's a policy before. Here's a policy today. Nothing changed.

6

We didn't touch anything those days that you were having
trouble.

(Id. at 20.) It was only at that point, according to RJRT, "that

[Plaintiff] finally mentioned to Blanks that [Plaintiff] did modify

the internal part of the group firewall policy on March 27th, but

that it should not have had an impact on anything." (Docket Entry

35 at 10 (citing Docket Entry 37-1 at 22-25, 43-50).)

Plaintiff, however, avers that, "[o]n Saturday, March 29, 2008

. . . [Plaintiff] pointed out to [] Blanks the policy change that

[Plaintiff] had made and then reversed on March 27, 2008." (Docket

Entry 45 at 7 (citing Docket Entry 45-3, ¶ 21).)[4]  Further,

---

[4]    RJRT argues that the statements in Plaintiff's
Declaration in which he avers that he "pointed out to" Blanks the
changes on March 29, 2008, "should be stricken and not be
considered by this Court, as they contradict [Plaintiff's] sworn
deposition testimony." (Docket Entry 47 at 6).  However, the
deposition testimony RJRT references does not necessarily conflict
with Plaintiff's Declaration.  For example, Plaintiff's deposition
testimony reflects that, when asked "Did Garry Blanks [on March 29,
2008] ask you if you changed any of the firewall policies?"
Plaintiff replied, "No.  I pointed out to him what was on the
console.  I showed him the internal policy, and I told him these
are the changes that I had made.  He never asked me.  I pointed it
out to him." (Docket Entry 36-2 at 33.)  The questioner thereafter
attempted to clarify exactly what Plaintiff and Blanks were looking
at when Plaintiff "pointed" something out and Plaintiff indicated
they "were not looking at previous versions of the policy," but
were discussing the making of changes to the existing policy for
the purpose of addressing the laptop issues.  (Id. at 35-36.)
Furthermore, later in the deposition and without reference to a
specific time period, Plaintiff indicated that he did not tell
Blanks about the changes Plaintiff had made and that Blanks would
not know about the changes unless he asked Plaintiff. (See Docket
Entry 48-1 at 55-58.)   Taken in the light most favorable to
Plaintiff, a reasonable factfinder could find that the deposition
testimony did not contradict the statements in Plaintiff's
Declaration.   Accordingly,  the  Court  will  not  discount  the

7

Plaintiff argues that the conversation on April 9, 2008, between Plaintiff and Blanks supports Plaintiff's timeline because "Blanks acknowledged that [Plaintiff] had told him previously about the policy changes that he had made, and therefore, that there had not been any concealment as [RJRT] maintains." (<u>Id.</u> at 8-9.) In support of that assertion, Plaintiff cites the following language from the exchange:

> [PLAINTIFF]: And the one I changed, that – on the 27th –
>
> [] BLANKS: The Saturday.
>
> [PLAINTIFF]: No, the 27th was to turn off the – the – to put it in monitor mode.
>
> [] BLANKS: Uh-huh (yes).
>
> [PLAINTIFF]: And the other thing I thought, well, could have been an issue, was the – you know, allowed the DNS or allowed DSEP, but I'm like, well, that shouldn't be a problem. But just in case it is, I'll just switch it back, you know, if that's the case. But that's internal though. That's not external. So I couldn't – you know . . .
>
> [] BLANKS: Well, let's just say people may have listened to you and walked away with we didn't change anything.

(<u>Id.</u> at 9 (quoting Docket Entry 37-1 at 22-23).)

### <u>Summary Judgment Standard</u>

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

Declaration, but will read it in context with Plaintiff's deposition testimony.

P. 56(a).  Such a genuine dispute exists if the evidence presented could lead a reasonable factfinder to return a verdict in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  In making this determination, the Court must view the evidence and any reasonable inferences therefrom in a light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The party moving for summary judgment may discharge its burden by identifying an absence of evidence to support the non-moving party's case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The non-moving party then must "set forth specific facts showing that there is a *genuine issue for trial*."  Matsushita Elec. Indus., 475 U.S. at 586-87 (citation omitted) (emphasis in original).  In this regard, the non-moving party must convince the Court that evidence exists upon which a finder of fact could properly return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 252 (citation omitted); see also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

## Proving Racial Discrimination or Retaliation

To establish discrimination or retaliation in employment under Title VII, Section 1981, or North Carolina law,[5] a plaintiff may proceed "in one of two ways. First, he may present direct evidence of his superiors' discriminatory [or retaliatory] intent. Second, he may attempt to satisfy the test specified in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), which allows him to raise an inference of discriminatory intent by showing that he was treated worse than similarly situated employees of other [relevant groups]." Sterling v. Tenet, 416 F.3d 338, 345 (4th Cir. 2003) (internal parallel citation omitted).[6] Plaintiff does not argue that the record contains direct evidence that his firing constituted discrimination based on race and/or retaliation for complaining about discrimination based on race. (See Docket Entry 45.) Accordingly, he must satisfy the McDonnell Douglas test, which first requires proof of a prima facie case. See Coleman v. Maryland Ct. of App., 626 F.3d 187, 190 (4th Cir. 2010), aff'd in other respects, ___ U.S. ___, 131 S. Ct. 1327 (2012).

---

[5] The same standards apply to discrimination and retaliation claims under either Title VII, Section 1981, or North Carolina law. See Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); Mallory v. Booth Refrigeration Supply Co., Inc., 882 F.2d 908, 910 (4th Cir. 1989).

[6] Although McDonnell Douglas arose in the discrimination context, its framework also applies to retaliation claims. See Hawkins v. Pepsico, Inc., 203 F.3d 274, 281 n.1 (4th Cir. 2000).

"[T]he elements of a prima facie case of discrimination
. . . are: (1) membership in a protected class; (2) satisfactory
job performance; (3) adverse employment action; and (4) different
treatment from similarly situated employees outside the protected
class." <u>Id.</u> "The elements of a prima facie retaliation claim
. . . are: (1) engagement in a protected activity; (2) adverse
employment action; and (3) a causal link between the protected
activity and the employment action." <u>Id.</u>[7] "'If a prima facie case
is presented, the burden shifts to the employer to articulate a
legitimate, nondiscriminatory [or non-retaliatory] reason for the
adverse employment action.' If the employer meets that burden of
production, 'the burden shifts back to the plaintiff to prove by a
preponderance of the evidence that the employer's stated reasons
were not its true reasons, but were a pretext for discrimination
[or retaliation].'" <u>Adams v. Trustees of the Univ. of N.C. –
Wilmington</u>, 640 F.3d 550, 558-59 (4th Cir. 2011) (internal citation
omitted) (quoting <u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>,
354 F.3d 277, 285 (4th Cir. 2004) (en banc)); <u>accord Hoyle v.
Freightliner, LLC</u>, 650 F.3d 321, 337 (4th Cir. 2011) ("If a

---

[7]     "[P]rotected activity" consists of "[o]pposition activity
[which] encompasses . . . voicing one's opinions in order to bring
attention to an employer's discriminatory activities . . . [and]
[p]articipation activity [which] encompasses . . . making a charge,
testifying, or participating in any manner in a Title VII
investigation, proceeding, or hearing." <u>Kubicko v. Ogden Logistics
Servs.</u>, 181 F.3d 544, 551 (4th Cir. 1999) (internal quotation marks
omitted).

plaintiff puts forth sufficient evidence to establish a prima facie case of retaliation and a defendant offers a non-discriminatory explanation for his termination, the plaintiff bears the burden of establishing that the employer's proffered explanation is pretext." (internal quotation marks omitted)).

## **Analysis**

Even if the Court assumes that Plaintiff has made out a prima facie case of racial discrimination and retaliation for reporting discrimination based on race, RJRT (as it argued in seeking summary judgment (see Docket Entry 35 at 16-20)) has carried its burden of producing a non-discriminatory and non-retaliatory reason for Plaintiff's firing (see Docket Entry 37-2 at 17-18 (indicating Plaintiff was fired because he "did not inform [his] peers [or] management about the changes [he] made on March 27, 2008 . . .[, he] misrepresented that [he] did not make any changes to the Checkpoint Integrity Firewall on multiple occasions when questioned by management and [his] peers . . .[, and] [his] actions seriously compromised the integrity of the Information Technology department")). As a result, to avoid summary judgment, Plaintiff must identify competent evidence sufficient to allow a reasonable factfinder to conclude that RJRT's stated reason for Plaintiff's dismissal constituted pretext for discrimination based on Plaintiff's race and/or for retaliation due to his reporting discrimination based on his race. "[W]hen an employer gives a

12

legitimate, non-discriminatory reason for discharging the plaintiff, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (internal quotation marks omitted). Here, Plaintiff has failed to show that the explanation RJRT gave for his termination did not constitute its real reason for firing him.

Although the Parties dispute exactly when Plaintiff attempted to inform Blanks about the changes Plaintiff had made, Plaintiff has presented no evidence to suggest that Long, the person who drove the decision to fire Plaintiff (see Docket Entry 35 at 11; Docket Entry 37-2 at 3-4), in fact believed that Plaintiff informed Blanks about the changes before April 9, 2008, or even that Blanks himself understood that Plaintiff had disclosed those changes prior to April 9, 2008. Under such circumstances, no material question of fact as to pretext exists. See Holder v. City of Raleigh, 867 F.2d 823, 829 (4th Cir. 1989) ("A reason honestly described but poorly founded is not a pretext, as that term is used in the law of discrimination."); accord Price v. Thompson, 380 F.3d 209, 214 n.1 (4th Cir. 2004) ("We note that mere mistakes of fact are not evidence of unlawful discrimination.").

Plaintiff argues that "[t]he fact that [] Long says that [Plaintiff] [admitted that he did not tell anyone about the changes

13

until April 9, 2008] is insufficient to make that an undisputed fact." (Docket Entry 45 at 16-17.) However, the question of when Plaintiff notified Blanks about changes Plaintiff made to the firewall is not the issue in a pretext analysis; rather, the issue is what the decisionmaker believed or understood at the time of the decision. <u>See, e.g.</u>, <u>Hawkins</u>, 203 F.3d at 279 (affirming summary judgment for employer where plaintiff, who was discharged for poor performance, "fail[ed] . . . to supply evidence that [decisionmaker] actually believed [plaintiff's] performance was good"); <u>Jordan v. Summers</u>, 205 F.3d 337, 344 (7th Cir. 2000) ("Pretext is a lie, not merely a mistake."). Long averred that "it was determined that [Plaintiff] had misled management and concealed changes he made to the firewall policy." (Docket Entry 37-2 at 3.) Although some question may exist as to the soundness of her conclusion, Plaintiff has failed to present any evidence indicating that Long did not actually hold that view at the time of Plaintiff's firing.

Neither has Plaintiff shown that Blanks understood that, in the immediate aftermath of the laptop problem, Plaintiff had identified the changes he made. Moreover, Plaintiff himself admitted that, in the conversation between Plaintiff and Blanks on April 9, 2008, "Blanks allowed that the root of the problem [regarding Plaintiff's prior communications] was . . . that unidentified 'people' - <u>perhaps [] Blanks himself</u> - <u>had walked away</u>

14

with the wrong impression ('. . . people may have listened to you and walked away with we didn't change anything.')" (Docket Entry 45 at 9 (emphasis added) (quoting Docket Entry 37-1 at 23); see also id. at 16 (referencing same in context of pretext).) The transcript of Plaintiff's conversation with Blanks on April 9, 2008, shows, at most, that Blanks may have admitted that, at an earlier date, Plaintiff may have attempted to make some reference to changes he had made, but that Blanks still did not perceive that Plaintiff had done so. (See Docket Entry 37-1 at 22-23.) Again, whether or not, prior to April 9, 2008, Plaintiff in fact attempted to inform Blanks about the changes Plaintiff made is not the issue. Pretext analysis turns on whether, at the time of Plaintiff's firing, Blanks actually understood that Plaintiff timely and properly notified Blanks of changes Plaintiff made to the system. The conversation between Blanks and Plaintiff on April 9, 2008, does not prove that point.

Nor does Plaintiff's deposition testimony concerning an interaction he had with Blanks on Saturday, March 29, 2008, establish that Blanks then knew about the changes Plaintiff made. In that testimony, Plaintiff asserted the following: "I pointed out to [Blanks] what was on the console. I showed him the internal policy, and I told him these are the changes I had made. He never asked me. I pointed it out to him." (Docket Entry 36-2 at 33.) Although Plaintiff argues that this testimony indicates he told

15

Blanks about the changes on March 29, 2008 (<u>see</u> Docket Entry 45 at 7), it does not show that Blanks understood that, by such "point[ing] out," Plaintiff had reported making changes to the firewall. Furthermore, as Plaintiff continued to explain the circumstances of this interaction in the deposition, it became apparent that he had "pointed out" the firewall policy as it existed after Plaintiff made the fresh copy on March 28, 2008. (<u>See</u> Docket Entry 36-2 at 233 ("Q. You pointed it out to him on the 29th? A. On the 29th because we were inside, and he wanted me to change the rule on the policy. Q. I thought when you created the fresh copy on the 28th, it deleted all of the previous versions? A. We're inside that policy.").) The record, setting out Plaintiff's own words, thus shows that Plaintiff did not "point out" changes he had made on March 27, 2008, no matter what he may have thought he conveyed.

Further, apart from her concern that Plaintiff waited over a week to tell anyone about his changes to the firewall, Long insisted on the termination of Plaintiff's employment (rather than reassignment) based on her view that: (1) Plaintiff had made the changes without any direction to do so from his supervisors (Docket Entry 37-2 at 2-3); (2) he created a fresh copy of the firewall policy, again without telling his supervisors, which erased the firewall history (<u>id.</u> at 3); and (3) he apparently lied to Long when he said he never used his individual login, yet the restored

16

firewall history showed he used his individual login to make the first change on March 27, 2008, a fact Long found "particularly troubling" (id.).  These unrefuted circumstances defeat any allegation of pretext.  See Henson v. Liggett Grp., Inc., 61 F.3d 270, 277 (4th Cir. 1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions . . . ."); see also Bacchus v. Tubular Textile LLC, No. 1:01CV00621, 2003 WL 21796550, at *6 (M.D.N.C. Mar. 19, 2003) (unpublished) ("Employers retain the right to make business decisions, even poor or inaccurate ones, so long as they do not violate the law." (citing Henson, 61 F.3d at 277)).

In the pretext discussion in Plaintiff's Response, he alleges that "there is ample record evidence from which a fact-finder reasonably could find that [RJRT] lied to the [Equal Employment Opportunity Commission ("EEOC")], and/or during discovery, and/or now to the Court about the material fact of who decided to terminate [Plaintiff]." (Docket Entry 45 at 18.)  In this regard, Plaintiff asserts that RJRT told the EEOC that "IT management" decided to fire him (id. at 17), that RJRT then told Plaintiff in its Answers to Plaintiff's First Interrogatories that Blanks, Mazza, Long, and Wood "collaboratively agreed" to terminate Plaintiff's employment (id. at 18), and that RJRT now represents to the Court that Long made the ultimate decision (id.).

17

As an initial matter, in the case Plaintiff cites in support of this argument, E.E.O.C. v. Sears Roebuck and Co., 243 F.3d 846 (4th Cir. 2001), the Fourth Circuit noted that "the fact that [the employer] has offered different justifications at different times for [the adverse employment action] is, in and of itself, probative of pretext," id. at 852-53 (emphasis added).  However, a plaintiff may not "seek to expose [an employer's non-discriminatory] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it.  The former would not create a 'genuine' dispute, the latter would fail to be 'material.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 216 (4th Cir. 2007) (internal quotation marks omitted).  The fact that an employer's identification of the decisionmaker varied is not the same as altering the justification for the decision.  Plaintiff's argument in this regard thus does not cast doubt on the validity of RJRT's non-discriminatory and non-retaliatory explanation for Plaintiff's firing.

Further, the record does not support Plaintiff's characterization of RJRT's statements about the decisionmaker. First, in its response to the EEOC, RJRT indicated that both "IT management" and "HR" participated in the "investigation" into Plaintiff's alleged misconduct.  (Docket Entry 45-2 at 10-11.) Further, RJRT stated that "[Plaintiff] was called into a meeting,

18

and on April 14, 2008, he was terminated for Violation of Company
Policy - HR Policies and Practices 1.03, paragraph 3 - Misconduct."
(Id. at 11.)  This statement does not, as Plaintiff suggests (see
Docket Entry 45 at 17-18), assert that IT management decided to
fire Plaintiff.

Next, in RJRT's Answers to Plaintiff's First Interrogatories,
RJRT reported that Blanks, Mazza, Long, and Wood "collaboratively
agreed . . . that termination of [Plaintiff's] employment was
appropriate." (Docket Entry 36-4 at 7.)  Comparatively, in support
of its instant Motion, RJRT asserts that, "[w]hile Mazza and Blanks
recommended that [Plaintiff] be removed from his position within IT
Security and possibly assigned elsewhere, Long determined that the
termination of [Plaintiff's] employment was the more appropriate
discipline in light of his conduct."  (Docket Entry 35 at 11.)
These two characterizations do not conflict with each other or with
the EEOC statement.

Simply put, "collaboratively agreed" does not signify
unanimity throughout the process.  Although Mazza and Blanks
initially recommended reassignment, Mazza testified that, when Long
and Wood asked them, "don't you think the right thing to do is to
terminate [Plaintiff]," Mazza and Blanks "probably just nodded."
(Docket Entry 48-3 at 23; see also Docket Entry 37-2 at 3-4
(setting forth Long's sworn statement that Blanks and Mazza "had
recommended to [Long] that [Plaintiff] be removed from his position

19

within the IT Security & Risk department [but that] [u]ltimately [Long] determined that termination of [Plaintiff's] employment was the more appropriate discipline and that he could not simply be assigned to another department, given his conduct").) Moreover, Mazza and Blanks carred out the actual firing. (See Docket Entry 36-3 at 11-13; Docket Entry 48-3 at 25.) Plaintiff has cited no evidence to call this account into question. Under these circumstances, the record establishes that Blanks, Mazza, Long, and Wood all took part in a discussion about Plaintiff's future, that they came into the discussion with different recommendations, and that they ultimately all acquiesced to the decision to fire him.[8]

In sum, the evidence, viewed in a light most favorable to Plaintiff, would not permit a reasonable factfinder to determine that the reasons RJRT gave for firing Plaintiff represented pretext for race discrimination and/or retaliation.

## Conclusion

RJRT has provided a non-discriminatory and non-retaliatory reason for its firing of Plaintiff. Plaintiff, in turn, has failed

---

[8]  In addition, "[w]hen the hirer and the firer are the same individual, there is a powerful inference . . . that discrimination did not motivate the employer . . . ." Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991). In the instant case, Blanks hired Plaintiff (see Docket Entry 36-1 at 5) and gave him a positive review for his work in 2006 (id. at 21-22). Accordingly, a strong inference exists that, whatever role Blanks played in the decision to fire Plaintiff, discriminatory animus did not motivate him. See Proud, 945 F.2d at 798. Nor has Plaintiff come forward with any evidence to suggest that Long, Wood, or Mazza exhibited any racial bias. (See Docket Entry 45 at 1-20.)

to show that record evidence raises a material question of fact regarding whether RJRT's explanation constitutes pretext for racial discrimination and/or retaliation.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Docket Entry 34) is **GRANTED**.

    /s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

January 24, 2013